IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARITY SCOTT | ) | CASE NO: |
| 6965 State Rt. 150 | ) | |
| Dillionvale, Ohio, 43917 | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| | ) | |
| vs. | ) | <u>COMPLAINT FOR DAMAGES</u> |
| | ) | |
| A&B SALES, INC. | ) | <u>(Jury Demand Endorsed)</u> |
| c/o Michael D. Ferns, Jr., Statutory Agent | ) | |
| 5310 Guernsey Street | ) | |
| Bellaire, Ohio, 43906 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| MICHAEL FERNS JR. | ) | |
| 25 Barrington Drive, | ) | |
| Wheeling, West Virginia, 26003 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| DAVE ELLIS | ) | |
| 130 Crisswill Road, | ) | |
| Saint Clairsville, Ohio, 43950 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| FRANK OLIVER | ) | |
| 1219 Pearl Street, | ) | |
| Martins Ferry, Ohio 43935 | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Charity Scott, by and through undersigned counsel, as her Complaint against

Defendant, states and avers the following:

**NATURE OF THE CLAIMS**

1.    This is an action for declaratory, injunctive and equitable relief, as well as monetary damages,

to redress Defendants' unlawful employment practices against Scott, including their

discriminatory treatment and harassment of Scott due to her gender and her open association with her boyfriend, an African American; their creation and perpetuation of a sexually hostile work environment and *quid pro quo* demands for sexual gratification; and their unlawful retaliation against Scott after she complained about unlawful discrimination and harassment in the workplace, in violation of Title VII of the Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e *et seq*. ("Title VII") and the West Virginia Human Rights Act ("WVHRA"), W. Va. Code §5-11-1, *et seq*.

## PARTIES.

2.  Scott is a resident of the city of Dillionvale, Jefferson County, state of Ohio.

3.  A&B Sales, Inc. ("A&B") is an Ohio corporation that lawfully conducts business as a retailer of new and used automobiles under the names "A&B Kia" and/or "A&B Auto Sales," in Benwood, West Virginia.

4.  Ellis is, and at all times referenced herein, was the General Manager of A&B.

5.  Ferns Jr. is, and at all times referenced herein, was an owner of A&B.

6.  Oliver is, and at all times referenced herein was an Accountant and/or Human Resources Manager for A&B.

## PERSONAL JURISDICTION.

7.  A&B is an Ohio corporation; hires citizens of the state of Ohio; contracts with companies in Ohio; and owns or rents property in Ohio. As such, the exercise of personal jurisdiction over A&B comports with due process.

8.  Ellis is a resident of Ohio. As such, the exercise of personal jurisdiction over Ellis comports with due process.

9.  At all times referenced herein, Ferns Jr. owned or rented property in Ohio, to include "Xtreme Motorcycle of Cambridge" in Cambridge, Ohio; hired citizens of the state of Ohio, and

incorporated businesses in Ohio. As such, Ferns Jr. has sufficient minimum contacts with Ohio and the exercise of personal jurisdiction over Ferns Jr. comports with due process.

10. Oliver is a resident of Ohio. As such, the exercise of personal jurisdiction over Ellis comports with due process.

11. This cause of action arose from or relates to the contacts of Defendants with Ohio residents, thereby conferring specific jurisdiction over Defendants.

## SUBJECT MATTER JURISDICTION AND VENUE.

12. This Court has jurisdiction over the subject matter of this action under Title VII of the Civil Rights Act of 1964, § 701 *et seq*., as amended, 42 U.S.C.A. § 2000e *et seq* and 28 U.S.C. § 1331.

13. Venue is proper in this District pursuant to 28 U.S.C § 1391(b)(1) & (c)(2) because A&B is a resident of this judicial district, and this Court has personal jurisdiction over A&B.

## COVERAGE.

14. A&B was and/or is an "employer" as defined by 42 U.S.C § 2000e(b), in that at all times referenced herein, it was a business engaged in an industry affecting commerce who had fifteen or more employees for each working day in each of twenty or more calendar weeks during the year(s), and/or year(s) preceding the allegations contained herein.

15. Ellis is a "person" as that term is defined by W. Va. Code, § 5-11-3(a).

16. Ferns Jr. is a "person" as that term is defined by W. Va. Code, § 5-11-3(a).

17. Oliver is a "person" as that term is defined by W. Va. Code, § 5-11-3(a).

## ADMINISTRATIVE HISTORY.

18. Prior to instituting this action, Scott filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2020-02203, alleging that A&B had discriminated against her because of her gender; subjected her to a sexually hostile

3

work environment and quid pro quo sexual harassment; and discriminated against her on the basis of her association with her African American boyfriend, Darrell.

19. The EEOC issued Scott a Right to Sue Notice on April 28, 2016, which she received on or about May 2, 2016.

20. A true and accurate copy of Scott's Right to Sue letter is attached hereto as Exhibit "A."

21. Scott has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

22. Scott has brought her claims under the West Virginia Human Rights Act ("WVHRA") within the two-year statute of limitations provided for by W. Va. Code, § 55-2-12. See *Price v. Boone Cty. Ambulance Auth.*, 175 W. Va. 676, 679, 337 S.E.2d 913, 916 (1985).

## FACTUAL ALLEGATIONS.

23. Scott is female.

24. Scott is Caucasian.

25. Scott is a former employee of A&B.

26. Scott was hired by A&B in or around 2016 as a Sales Person.

27. At all times referenced herein, A&B did not have an employee handbook or any written policies concerning sexual harassment, discrimination, or retaliation.

28. A&B never promogulated or issued any policies concerning sexual harassment, discrimination, or retaliation during Scott's employment.

29. Scott was never advised or trained about any A&B policies concerning sexual harassment, discrimination, or retaliation.

30. A&B is not in possession of any documents that would establish that Scott was ever advised or trained about any A&B policies concerning sexual harassment, discrimination, and/or retaliation.

31. Scott was promoted to the position of Sales Manager in or around 2017.

32. Soon after Scott began her employment with A&B, she was subjected to severe and pervasive sexual harassment by A&B's employees and managers.

33. Scott was targeted on a nearly daily basis during her employment with A&B for unwanted sexual jokes, unwanted touching, and unwanted sexual remarks and/or suggestions.

34. For example, Ellis regularly demanded that Scott send him nude and/or scantily clad "butt pics" via text message in exchange for favorable terms on deals she was working on, such as the amount he would allow for a customer's trade-in ("*Quid Pro Quo* Demands").

35. Ellis did not make *Quid Pro Quo* Demands to male employees.

36. Ellis made Quid Quo Pro Demands to Scott because she is female.

37. Ellis' *Quid Pro Quo* Demands constituted sexual harassment.

38. Ellis' *Quid Pro Quo* Demands created a sexually hostile work environment for Scott.

39. Scott often gave in to Ellis' *Quid Pro Quo* Demands in order to make sales, which she depended on for income, by sending Ellis pictures of her nude and/or scantily clad butt.

40. Scott was offended by Ellis' *Quid Pro Quo* Demands.

41. Scott felted demeaned and humiliated by Ellis' *Quid Pro Quo* Demands.

42. Ellis escalated his harassment of Scott after she complied with his *Quid Pro Quo* Demands by engaging in the following harassing conduct:

    a. Telling Scott's co-workers that he planned to open a strip club called "bottoms up" using the photos Scott was compelled to provide him as marketing material; and

    b. Regularly telling Charging Party to "turn around" so that he and Scott's male co-workers could see Scott's butt;

43. Ellis' remarks regarding opening a strip club using photos of Scott's butt constitutes sexual harassment.

44. Ellis' remarks regarding opening a strip club using photos of Scott's butt constitutes sexual harassment created a sexually hostile work environment for Scott.

45. Ellis' demands that Scott turn around so he could see her butt constitutes sexual harassment.

46. Ellis' demands that Scott turn around so he could see her butt created a sexually hostile work environment for Scott.

47. Scott was also regularly subjected to sexual harassment by Ferns Jr.

48. For example, Ferns Jr. regularly sent Scott unsolicited, flirtatious text messages in which he sent Scott nude pictures of himself and photos of his penis.

49. On one or more occasions, Ferns Jr. sent Scott flirty text messages in which he would suggest that Scott leave work and meet him somewhere because "today is a good snuggle day."

50. Ferns Jr.'s text messages to Scott constitute sexual harassment.

51. Ferns Jr.'s text messages to Scott created a sexually hostile work environment for Scott.

52. Ferns Jr. regularly referred to Scott's butt as her "money maker."

53. Ferns Jr.'s remarks to Scott that her butt was her "money maker" constitutes sexual harassment.

54. Ferns Jr.'s remarks to Scott that her butt was her "money maker" created a sexually hostile work environment for Scott.

55. Ferns Jr. regularly touched Scott inappropriately without her permission, sneaking up behind her and touching her ears and/or shoulders, and sliding his fingers under Scott's chin.

56. On another occasion, Ferns Jr. pinned Scott against a desk as she was looking for keys and aggressively rubbed his crotch and his semi-erect penis against her butt.

57. Ferns Jr.'s unwelcome touching constitutes sexual harassment.

58. Ferns Jr.'s unwelcome touching created a sexually hostile work environment for Scott.

59. On yet another occasion, Ferns Jr. told Scott that it was "too bad" A&B's medical insurance "won't cover (breast) implants, you would probably sell more" and suggested that he would

be willing to pay out of pocket for Scott to get breast implants if Scott would have sex with him and let him "try them out."

60. Ferns Jr.'s offer to pay for Scott's breast augmentation in exchange for sex constitutes sexual harassment.

61. Ferns Jr.'s to pay for Scott's breast augmentation in exchange for sex created a sexually hostile work environment for Scott.

62. Ferns Jr. regularly made jokes of a sexual nature at Scott's expense to her male co-workers.

63. In or January of 2019, Scott began dating Darrell, who is African American.

64. Darrell visited Scott at work on a handful of occasions to bring her lunch.

65. Though conversations with Scott and as a result of Darrell's visits to A&B's dealership, Ellis was aware that Scott associated with and dating an African American.

66. Though conversations with Scott and as a result of Darrell's visits to A&B's dealership, Ferns Jr. was aware that Scott associated with and dating an African American.

67. Soon after Ellis and Ferns Jr. learned that Scott was dating Darrell, they began to treat Scott differently.

68. Soon after Ferns Jr. learned that Scott was dating Darrell, he began to demand that Scott engage in sex acts with Ferns Jr. before Scott and Darell had sex.

69. Ferns Jr. told Scott "just let me hit it before the black snake goes in," in reference to her Darrell's penis ("Demand To Have Sex")

70. Scott rejected Ferns Jr's Demand To Have Sex.

71. Ferns Jr's remarks to Scott about letting him "hit it before the black snake goes in" constituted sexual harassment.

72. Ferns Jr's remarks to Scott about letting him "hit it before the black snake goes in" created a sexually hostile work environment for Scott.

73. Ferns Jr. repeatedly told Scott she should dump Darrell and "find a rich guy," like Ferns Jr., before she "got old" ("Demand to Date").

74. Scott rejected Ferns Jr's Demand To Date.

75. Ferns Jr's Demand to Date constituted sexual harassment.

76. Ferns Demand to Date created a sexually hostile work environment for Scott.

77. On another occasion, Ferns Jr. asked Scott "how is life on the dark side" and remarked "once you go black you never go back."

78. Ferns Jr. repeatedly told Scott she could "do better" than "some guy from the hood" in reference to Darrell.

79. Soon after Ellis and Ferns Jr. learned that Scott was dating Darrell, they took her "demo car," a new car she was permitted to drive as a Sales Manager, away.

80. Soon after Ellis and Ferns Jr. learned that Scott was dating Darrell, they demoted Scott from Sales Manager back to Sales Person.

81. Ellis and Ferns Jr. reassigned Scott from her desk, where she had a computer and phone, to a desk where she did not have a computer or a phone.

82. Ellis and Ferns Jr. demoted Scott because she was dating an African American.

83. Ellis and Ferns Jr. demoted Scott because she chose to date Darrell rather than submit to their sexual advances.

84. Ellis and Ferns Jr. were jealous of Darrell's relationship with Scott.

85. Defendant's demotion of Scott was an adverse action against her.

86. Defendant knowingly demoted Scott.

87. Defendant willfully demoted Scott.

88. As a purported justification for demoting Scott, Ellis and Ferns Jr. claimed that Scott had violated A&B rules by using her cell phone while she was at work.

89. Defendant's purported justification for demoting Scott was not the true reason Scott was demoted, but a pretext for discrimination against Scott because Scott associated with and was dating Darell, an African American.

90. Defendant's purported justification for demoting Scott was not the true reason Scott was demoted, but a pretext for discrimination against Scott because Scott had refused Ferns Jr.'s sexual advances.

91. Soon after Ellis and Ferns Jr. learned that Scott was dating Darrell, they began to nitpick Scott's work and subjecting her to different rules and requirements than other employees.

92. For example, other employees were permitted to have a fan or small heater on or near their desk in order to stay comfortable (depending on the season), but Ellis and/or Ferns Jr. repeatedly yelled at Scott if she did the same.

93. Scott was permitted to keep a fan/and or heater on her desk prior to Ellis and Ferns Jr. learning about her relationship with Darrell.

94. Ellis and Ferns Jr. allowed other employees to use their cellular phones to take personal calls from time to time but yelled at Scott if she did the same.

95. Scott was permitted to use her cellular phone to take personal calls prior to Ellis and Ferns Jr. learning about her relationship with Darrell.

96. Ellis and Ferns Jr. loosely enforced A&B's policies regarding what timeliness to work and regularly allowed employees to report to work several minutes late without consequence.

97. Subsequent to learning that Scott was dating Darrell, Ellis and Ferns Jr. would yell at Scott if she was even one minutes late to work.

98. At all times referenced herein, A&B's management had a practice of recognizing employee birthdays with a small cake for that employee and their co-workers to enjoy.

99. In or around December of 2019, Ellis presented Scott with a cake for her birthday in front of Scott's co-workers that was shaped like a black penis and testicles.

100. Scott was shocked and offended to receive a black penis cake for her birthday.

101. Scott was humiliated when Ferns Jr gave her a black penis cake for her birthday.

102. Ellis' giving Scott a black penis birthday cake constitutes sexual harassment.

103. Ellis' giving Scott a black penis birthday cake created a sexually hostile work environment for Scott.

104. Ellis did not give male employees birthday cakes shaped like penises.

105. Ellis gave Scott a black penis cake because she is female.

106. Ellis gave Scott a black penis cake because she was dating Darrell, an African American.

107. During another instance of racially charged sexual harassment toward Scott, Ferns Jr. told one of Scott's African American co-workers, Ivy Bradshear, that Scott gave him "the HIV."

108. Scott had never slept with Bradshear.

109. Ferns Jr. stated and/or implied that Scott had sex with Bradshear because Bradshear is African American.

110. Ferns Jr. followed up the HIV remark by stating in reference to Scott's vagina: "that one day she (Scott) swung around in that chair I was like woooo…(fake coughing sound), next thing I know I started coughing and…she's the Medusa of A&B. I got the HIV just seein' it... all you gotta do is take one little peek at that thing and you'll lose 100 pounds." ("Vagina Remarks").

111. As part of his Vagina Remarks, Ferns Jr. further stated to Bradshear that he was "a little fat now but just look at it (Scott's Vagina) and you will lose 100lbs just like that" because Bradshear would "get the HIV."

112. During 2019, A&B offered access to a gym and personal trainer to its employees ("Fitness Program").

113. Scott signed up for and/or elected to participate in A&B's Fitness Program.

114. When Ferns Jr. learned that Scott was going to participate in the Fitness Program, he demanded that Scott have videos of herself taken while she was exercising at the gym with a trainer and that those videos and photos be shared with him for his personal enjoyment.

115. Ferns Jr. did not require male employees who participated in the Fitness Program to provide photos or videos of themselves working out.

116. Ferns Jr. demanded to receive photos and or videos of Scott working out because he wanted to ogle at and/or view Scott's body in tight fitting clothes while she was doing exercises.

117. Ferns Jr. demanded to receive photos and or videos of Scott working out because he believed such videos and/or imagery would provide him with sexual gratification.

118. Ferns Jr. demanded that Scott provide photos and videos of herself workout as a condition to Scott's participation in the Fitness Program.

119. Ferns Jr. did not require male employees to submit photos and videos of themselves exercising in order to participate in the Fitness Program.

120. Ferns Jr. demanded to receive photos and or videos of Scott working out because she is female.

121. Encouraged by the conduct of their managers, Scott's co-workers also made sexually harassing remarks to Scott.

122. Bradshear regularly made inappropriate remarks to Scott of a sexual nature and falsely suggested to Scott's co-workers that he had slept with Charging Party.

123. Bradshear often made sexually harassing remarks to Scott in front of Ellis and/or Ferns Jr., who would laugh in response and/or make sexually harassing comments of their own rather than taking steps to stop Bradshear's conduct.

124. For example, on at least one occasion, Bradshear stated to Scott ""stop standing like that! You wanna…I don't know, any way you stand makes me want to fuck you. Look at that shit.

Nothing…nothing your going to do works. It's all sexy as shit. You ever been raped? Someone's gonna rape you."

125. Bradshear then told Scott ""you could fart while we [sic]fucking and I wouldn't even break stride. I wouldn't even notice that shit….soon as I put it in I'm bustin.'"

126. On another occasions, Bradshear told another male employee "sometimes you gotta smack a bitch with your dick" in front of Scott.

127. Bradshear regularly grabbed Scott's butt without her permission.

128. Bradshear's sexual remarks to Scott and to others concerning Scott constituted sexual harassment.

129. Bradshear's sexual remarks to Scott and to others concerning Scott created a sexually hostile work environment for Scott.

130. Bradshear's touching Scott's butt constituted sexual harassment.

131. Bradshear's touching Scott's butt created a sexually hostile work environment for Scott.

132. Another Sales Person, Doug Duda, regularly participated in the sexual harassment against Scott.

133. Duda often made sexually harassing remarks to Scott in front of Ellis and/or Ferns Jr., who would laugh in response and/or make sexually harassing comments of their own rather than taking steps to stop Duda's conduct.

134. For example, Duda once stated to Scott that he would "swim backwards up a river of shit to suck the dick of the man who last fucked you."

135. On another occasion, Duda suggested in front of Bradshear and Ellis that Scott put a Fox Racing tattoo on her "ass" at the request of Scott's ex-boyfriend because he would have thought it was "hot" and it would "make him hard." ("Fox Tattoo Joke").

136. Ellis responded to the Fox Tattoo Joke by laughing rather than taking any steps to stop Duda's sexually harassing conduct.

137. Duda's sexual remarks to Scott and to others concerning Scott constituted sexual harassment.

138. Duda's sexual remarks to Scott and to others concerning Scott created a sexually hostile work environment for Scott.

139. Another Sales Person for A&B, Josh Albright, once told Ellis in front of Scott that Scott's vagina was "so loose fucking her is like throwing a hotdog down a hallway" ("Hotdog Joke").

140. Ellis responded to the Hotdog Joke by laughing rather than taking any steps to stop Albright's sexually harassing conduct.

141. Albright's sexual remarks to Scott and to others concerning Scott constituted sexual harassment.

142. Albright's sexual remarks to Scott and to others concerning Scott created a sexually hostile work environment for Scott.

143. The sexual harassment Scott faced at A&B was so pervasive that for most of Scott's employment, she felt compelled to try and tolerate it.

144. While Scott pretended on the outside to tolerate the relentless sexual harassment she faced at A&B in order to preserve her job, in reality, she was humiliated and emotionally devastated.

145. Scott possesses audio recordings of several of the sexually harassing remarks that were made to her during her employment with Defendant.

146. On March 24, 2020, Scott was talking with a co-worker named Bill Haught when he told her he was going to be off the following day, March 25, 2020.

147. Haught had a computer and phone at his desk.

148. Haught's desk was located in a prime area of the dealership that had far greater exposure to customers than Scott's desk.

149. Scott wanted to sit at Haught's desk because she believed it would make her more effective at doing her job.

150. Scott wanted to sit at Haught's desk because she believed it would help her sell more cars.

151. Scott asked Haught if he would object to her sitting at his desk while he was out on March 25, 2020.

152. Haught responded to Scott by stating that he had no objection to Scott sat at his desk while he was out.

153. On March 25, 2020, another owner of A&B, Mike Ferns Sr. (the father of Ferns Jr.) yelled at Scott when he saw her sitting at Haught's desk.

154. Scott was deeply upset that Ferns Sr. had yelled at her when she was simply trying to do a better job at selling cars.

155. Subsequently, Scott complained to Ellis by text message that she was sick of being mistreated ("Text Message Complaint").

156. In her Text Message Complaint, Scott complained that "Everyone can sexually harass n [sic] joke n [sic] have fans and heaters at their desk amd [sic] demos!! But what tf [sic] did I do?? Was only phone ??? [sic] Everyone else gets on their phones too!!!"

157. By stating "But what tf [sic] did I do?? Was only phone ??? [sic] Everyone else gets on their phones too!!!," Scott was expressly referring to Defendant's purported, pretextual justification for demoting her.

158. Ellis did not respond to Scott's Text Message Complaint.

159. Defendants failed to investigate Scott's complaint that "Everyone can sexually harass n [sic] joke."

160. On March 31, 2020, Scott made a second complaint about sexual harassment at A&B by email ("Sexual Harassment Complaint") to Ferns Jr. and Ellis in which she stated:

Jr. and Dave,

I am writing this email after spending a lot of time thinking about things and what has been like for me to work here. I love selling cars, but I hate how I am treated. I cannot just sit here and try to pretend it is okay anymore.

I am not a sex object or just a dumb woman, yet that is how I am treated. Not just by co-workers, but by both of you as well. Everyday someone touches me or says something sexual. Iry has flat out said he wants to fuck me so many times and he has touched my ass and my hips, he has even pulled my hand towards his penis. He has said really nasty, offensive things to me about how he thinks "sometimes you need to slap a bitch in the face with your dick" with you both present and he has told me he wants to "bite my asshole." Often his behavior was encouraged. He is not the only one either. You heard about when Doug said he would swim backwards in a river of shit to "suck the dick of the man who last fucked me." You didn't tell him to stop or that it was wrong to say that. Instead, you laughed. I don't know how many times I was told to stand up and turn around, walk backwards to a customer, or hurry and get some guy so he could see my "money makers".

Dave, you are not above this either. When I first started working here, you said for me send you pictures of my ass to get good trade in offers, knowing that I need the commissions to survive. I am embarrassed that I did it. And other times people would say " Stand up Charity, let him see! "

Jr., you were part of it to. I will never forget the dick picture you sent me or how you rubbed your crotch on me near the keys in washbay. Or how you wanted to see pictures of me exercising, which was so creepy! I was the only one that had to tape and send my workouts. Others said they would have quit right then had that of been asked of them. I know you aren't doing these kinds of things to me anymore, but I also do not appreciate all the nasty things you have to say about Darrell. I cannot understand how you can have no problem hiring black men but god forbid one of your white employees dates a black man. You have said racist things to me about the size of Darrell's penis, told me I am on the dark side, etc, which has hurt me so much. Ever since I started dating Darrell, I feel like you have wanted me out of here. You have been nitpicking ever since then, and I cannot help but think it is because of Darrell. I noticed that your flirting and sexual advances stopped just as your insults about Darrell and nitpicking my work began and I think it is because you feel jealous or something. But I was never interested in you in that way anyways so I don't understand why you would feel that way.

You also treat me differently than other sales managers. I can't use my phone, they can. I can't have a fan or space heater, they can. I can't be even a few minutes late, but they can. I was the only one that got my demo taken away, meanwhile you let Mike Robinson drive them and new managers that you hire before they hit the supposed "20%." And when asked about what percentage I need to make now since there's more managers, I was never answered. Its BS and you know it. I was by far the most easy going, cooperative, manager. Other's constantly bicker and fuss, sneak away and screw in closets, steal, got in demo's that we weren't suppose [sic] to, drink and do drugs in demo's, leave early or disappear for long periods. Yet I've been singled out many times. How many other sales managers have you continually demoted and re-promoted? I don't understand why you treat me so differently – is it because I am a woman?

15

> You have no idea how just putting up this crap over the years has made me feel. I guess that is my fault for being scared to speak up and laughing stuff off just because I needed a job. That ends today. **I really like my job and want to keep it**, but if I am forced to choose between staying here and being mistreated and abused or being unemployed, I will chose to be unemployed.

(**Emphasis** added).

161. A true and accurate copy of Scott's Sexual Harassment Complaint to Ellis and Ferns Jr. is attached hereto as Exhibit B.

162. Scott also provided a copy of her Sexual Harassment Complaint to Oliver.

163. Oliver did not acknowledge or respond to Scott's Sexual Harassment Complaint.

164. Scott's Sexual Harassment Complaint clearly communicated that Scott wanted the sexual harassment to stop or she would be forced to quit.

165. Scott's Sexual Harassment Complaint did not state that Scott was quitting at that time.

166. No reasonable person would read Scott's Sexual Harassment Complaint and believe that she was quitting at that time.

167. Scott had previously arranged to take a few days of vacation beginning on or about April 1, 2020.

168. Scott started her vacation on April 1, 2020.

169. Scott hoped that Ellis, Ferns Jr., Ferns Sr., Oliver, or someone else within A&B's management would reach out to her during her vacation to discuss her Sexual Harassment Complaint.

170. Defendants ignored Scott's Sexual Harassment Complaint.

171. No one from A&B contacted Scott to discuss her Sexual Harassment Complaint.

172. At all times referenced herein, Scott had remote access to her email.

173. During Scott's vacation, her A&B email account was deleted.

174. After learning that her email account had been deleted, Scott sent Ellis a text message in she asked why her email had been deleted ("Email Text Message").

175. Ellis did not respond to Scott's Email Text Message.

176. Deleting Scott's email account was an adverse action against Scott.

177. Upon information and belief, Ellis and Ferns Jr. deleted Scott's Sexual Harassment Complaint from their email and then deleted Scott's email in their own email inboxes as part of a misguided effort to destroy evidence that Scott had ever made the Sexual Harassment Complaint.

178. Upon information and belief, Ellis and Ferns Jr. tried to destroy evidence of Scott's Sexual Harassment Complaint because Scott had described Ellis and Ferns Jr.'s own misconduct in the Sexual Harassment Complaint.

179. During Scott's vacation, she learned from another A&B employee, Heather Moore, that Ferns Jr. had told Moore to remove Scott from A&B's computer-based sales system, "Promax."

180. Removing Scott from the Promax system was an adverse action against Scott.

181. During Scott's vacation, Scott learned that A&B had distributed all of her sales leads to other employees.

182. Distributing Scott's sales leads to other employees was an adverse action against Scott.

183. During Scott's vacation, she learned that A&B had paid commissions on deals to which she would have been entitled to commissions to other employees.

184. Paying Scott's commissions to other employees was an adverse action against Scott.

185. Defendants responded to Scott's Sexual Harassment Complaint by attempting to terminate her employment.

186. Defendants' attempt to terminate Scott was an adverse action against Scott.

187. Defendant knowingly attempted to terminated Scott.

188. Defendant willfully attempted to terminated Scott.

189. Concerned about her job Scott, went to A&B on Saturday, April 4, to talk to Ellis.

17

190. Scott questioned Ellis about the various adverse actions that been taken against her during her absence.

191. Ellis told Scott that the dealership was merely "having a computer problem" and that A&B would get her a new email the following Monday, April 6, 2020.

192. Ellis' representations regarding Scott's access to her email and Promax was a lie.

193. Ellis lied to Scott in order to cover up Defendant's retaliatory attempted termination of Scott.

194. Ellis told Scott that he would tell Ferns Jr. and that Ferns Jr. would contact someone about fixing Scott's access to Promax and her email.

195. Scott returned to work on Monday, April 6, 2020.

196. Scott did not have a working email when she returned to work on April 6, 2020.

197. Scott was still removed from Promax when she returned to work on April 6, 2020.

198. Scott attempted to follow up with Ellis on April 6, 2020 about her inability to perform her job duties due to being out of A&B's email and Promax systems.

199. Ellis told Scott that Ferns Jr. had put in a call to Promax and that he was waiting on a call back.

200. Ellis suggested to Scott that it was difficult to get ahold of Promax and suggested that they might be "closed."

201. Ellis lied again when he represented to Scott that Ferns Jr. and/or Defendant was trying to fix her access to Promax and her email; that Promax was not answering; and that Promax was not returning calls.

202. At all times referenced herein, Ellis and other A&B employees had complete control over who had access to the Promax systems and could add and remove employees at will without any assistance from Promax.

203. In reality, Defendant deliberately failed to take any action to fix Scott's email or to provide her access to Promax because it wanted to "starve" Scott from being able to make any sales and thus, from making any income other than her minimal draw.

204. Defendant wanted to "starve" Scott of sales so she would quit.

205. Instead of quitting, Scott made repeated efforts to have her access to her email and Promax restored.

206. Scott was unable to perform her job duties when she returned to work on April 6, 2020 because of the adverse and retaliatory actions Defendant had taken against her.

207. During Scott's first day back at work on April 6, 2020 after her short vacation, Ferns Jr. refused to speak with Scott and looked the other way when he saw her.

208. Scott reported to work on April 7, 2020.

209. Scott did not have working email when she reported to work on April 7, 2020.

210. Scott was still removed from Promax when she reported to work on April 7, 2020.

211. Scott was unable to perform her on April 7, 2020 because of the adverse and retaliatory actions Defendant had taken against her.

212. Frustrated that no action was being taken to restore her ability to perform her job, Scott called Promax directly for assistance on April 7, 2020.

213. Contrary to Ellis' assertions regarding the purported unresponsiveness of Promax, "Bill," a representative from Promax, answered almost immediately after Scott called.

214. Bill advised Scott that certain employees of A&B could restore her access directly and that Promax could not do it remotely.

215. One of the employees Bill identified as having the ability to restore Scott's Promax access was Ellis.

216. Scott recorded her phone call with Promax and Bill.

217. Subsequently, Scott approached Joe Cerone, another employee who had been identified by Bill from Promax, to help her gain access to Promax.

218. Cerone told Scott he would have to look into her request.

219. Scott reported to work on April 8, 2020.

220. Scott did not have working email when she reported to work on April 8, 2020.

221. Scott was still removed from Promax when she reported to work on April 8, 2020.

222. Scott was unable to perform her job duties on April 8, 2020 because of the adverse and retaliatory actions Defendant had taken against her.

223. At all times referenced herein, Scott was the mother of two minor children.

224. In or around February and March of 2020, the Coronavirus began to impact life in the United States significantly, resulting in the shutting down of schools and non-essential businesses.

225. Scott's minor children attend public schools.

226. In or around March of 2020, the schools attended by Scott's children shut down.

227. Scott had to scramble and work with her family members to ensure someone could watch her minor children while she was at work.

228. In March of 2020, Congress passed the Families First Coronavirus Relief Act ("FFCRA").

229. The FFCRA became effective April 1, 2020.

230. The FFCRA provided paid leave under certain circumstances, such as when a parent's children were at home due to the coronavirus.

231. On April 8, 2020, Scott approach Ellis to discuss her continued inability to access Promax and to learn more about her eligibility for FFCRA leave in light of her children being home from school ("April 8 Ellis Meeting").

232. As Scott discussed her FFCRA leave eligibility during the April 8 Ellis Meeting, she asked Ellis if he had received her Sexual Harassment Complaint.

233. Ellis responded to Scott's question about whether he had received her Sexual Harassment Complaint by stating "no."

234. Ellis lied again when he claimed that he had not received Scott's Sexual Harassment Complaint.

235. Ellis did not react or otherwise ask Scott to explain when she stated that she had made a Sexual Harassment Complaint.

236. Scott made an audio recording of the April 8 Ellis Meeting.

237. Subsequently, Scott spoke with Ferns Jr. about being unable to access Promax; her rights under the FFCRA; and her Sexual Harassment Complaint ("First April 8 Meeting With Ferns Jr.")

238. During the First April 8 Meeting With Ferns Jr., Ferns Jr. denied knowing anything about Scott being unable to access Promax or efforts to restore her access.

239. Ferns Jr. lied when he told Scott that he did not know anything about her not having access to Promax.

240. In reality, Ferns Jr. told Heather Moore to remove Scott from Promax on March 31, 2020, the same day Scott emailed Ferns Jr. her Sexual Harassment Complaint.

241. During the First April 8 Meeting With Ferns Jr., Ferns Jr. denied receiving Scott's Sexual Harassment Complaint.

242. Ferns Jr. lied when he told Scott that he did not receive her Sexual Harassment Complaint.

243. Scott made an audio recording of the First April 8 Meeting With Ferns Jr.

244. Shortly after the First April 8 Meeting With Ferns Jr., Scott printed a paper copy of her Sexual Harassment Complaint and a Department of Labor document concerning the FFCRA, and gave both to Ferns Jr. ("Second April 8 Meeting With Ferns Jr.")

245. Ferns Jr. snapped at Scott when she handed him the FFCRA paperwork, "you can't be walking in here like that, okay?"

246. Scott responded to Ferns Jr. by telling him she would further discuss the FFCRA with Ellis and by then giving Ferns Jr. a paper copy of her Sexual Harassment Complaint.

247. Ferns Jr. angrily yelled at Scott "take it (the Sexual Harassment Complaint) with you, I don't want it on my desk!!"

248. Scott made an audio recording of her Second April 8 Meeting With Ferns Jr.

249. Cerone restored Scott's access to Promax later on April 8, 2019.

250. Scott reported to work on April 9, 2020.

251. Upon arriving at work, Scott went to again discuss FFCRA leave and her Sexual Harassment Complaint with Ellis ("April 9, 2020 Ellis Meeting").

252. During the April 9, 2020 Ellis Meeting, Ellis pressured Scott to accept a lay off rather than taking FFCRA leave.

253. Ellis framed a proposed layoff as potentially allowing Scott to "make more money" than if she took FFCRA leave.

254. In reality, Ellis wanted Scott to accept being laid off so she would not come back to work at A&B.

255. Scott declined to be laid off.

256. Scott gave Ellis a paper copy of the Sexual Harassment Complaint during the April 9, 2020 Ellis Meeting.

257. Ellis responded to Scott by telling her to "just take off" and that Ferns Jr. would "look into" her FFCRA request "later."

258. Subsequently, Scott left work as Ellis suggested.

259. In the two weeks that passed between April 9, 2020, and April 21, 2020, Scott did not receive any pay as she was supposed to under the FFCRA.

260. When Scott was not paid, she contacted Oliver.

261. Oliver told Scott he would send her FFCRA paperwork and warned Scott that she would be committing "fraud" if she had a guardian who could watch her kids.

262. Oliver suggested to Scott that she consider "taking a layoff," just as Ellis had previously suggested.

263. Scott refused to "accept" a lay off.

264. On April 21, 2020 Scott followed up with Oliver by email about her FFCRA rights and further, complained that "I also made a complaint about the way I've been treated, the double standards held, and the sexual harassment that's been going on for 4 years. It's been over 2 weeks and I've heard nothing from anyone. You cannot go against the laws put in place" ("April 21 Email").

265. Oliver responded to Scott's April 21 Email by providing attaching FFCRA paperwork and explaining that he had checks for Scott in his office.

266. Oliver did not acknowledge or respond to Scott's complaint that her Sexual Harassment Complaint was being ignored when he responded to Scott's April 21 Email.

267. The paperwork Oliver sent Scott indicated that Scott would only be eligible for FFCRA leave if she did not have a co-parent or co-guardian available to watch her children.

268. The FFCRA does not contain language limiting the availability of FFCRA leave to parents who have no co-parent or co-guardian available to watch their children.

269. Scott did not want to sign A&B's form with the "co-parent or co-guardian" language because she occasionally did have family members who might watch her kids if she urged them to do so.

270. Scott did not have a reliable "co-parent or co-guardian" available to watch her kids every day for every hour that she needed to be at work.

271. Scott feared that Defendant had included the "co-parent or co-guardian" language in order to create a reason to terminate her if a guardian ever watched her children, even for a few minutes, while she was on FFCRA leave.

272. Scott's fear about Defendant's intention was further informed by Oliver's insistence that Scott sign the paperwork in person and pick up her checks in person, which would require Scott to bring her children into A&B during the height of the "first wave" of the pandemic.

273. Scott believed Defendant would attempt to terminate her for "fraud," as Oliver had suggested previously, if she had someone watch her kids while she travelled to A&B to complete the paperwork and pickup her checks.

274. Scott responded to Oliver by asking questions about her medical insurance; complaining about the added "co-parent or co-guardian" language to A&B's FFCRA form; and again asking about the status of her Sexual Harassment Complaint "since you are in HR."

275. Oliver responded to Scott on April 22, 2020 by only addressing Scott's questions about medical insurance and the FFCRA paperwork.

276. Oliver again ignored Scott's questions about her Sexual Harassment Complaint.

277. Scott continued to resist Defendants efforts to include the "co-parent or co-guardian" language in her FFCRA paperwork, at one point going as far as to electronically send the completed forms with the added language crossed out.

278. Defendant refused to accept Scott's FFCRA paperwork with the added "co-parent or co-guardian" language crossed out.

279. Defendant continued to be difficult and to refuse to pay Scott under the FFCRA until early May, 2020.

280. On May 1, 2020, Scott again complained to Oliver that "you still haven't [sic] addressed my sexual harassment [sic] complaint" ("May 21 Email").

281. Oliver responded to Scott's May 21 Email by claiming to have only first learned about Scott's allegations of sexual harassment "last week" and patronizingly suggesting that "If you had approached me while you were here, I would have started an investigation that very day. I am not one to tolerate any type of sexual harassment at all."

282. Oliver expressly refused to investigate Scott's Sexual Harassment Complaint, stating "I have nothing to investigate because you never spoke to me about it" *even as Scott was trying to do just that.*

283. Oliver refused to address or investigate Scott's Sexual Harassment Complaint because he wanted Scott to quit.

284. Oliver refused to address or investigate Scott's Sexual Harassment Complaint in order to retaliate against Scott for making the Sexual Harassment Complaint.

285. Oliver aided and abetted A&B, Ellis, and Ferns Jr's retaliation against Scott by openly refusing to do anything about Scott's Sexual Harassment Complaint.

286. Scott was still employed by A&B each time she complained to Oliver about the lack of a response to her Sexual Harassment Complaint.

287. Oliver lied when he claimed to have not heard of Scott's Sexual Harassment Complaint until Scott emailed him.

288. Oliver had been aware of Scott's Sexual Harassment Complaint since at least March 31, 2020.

289. Oliver knowingly and intentionally dismissed Scott's Sexual Harassment Complaint because it implicated his bosses – Ellis and Ferns Jr. – in sexually harassing misconduct.

290. Because it was clear that Defendants would never take steps to address her concerns about sexual harassment, Scott did not want to return to a work environment where she would continue to be sexually harassed.

291. Scott did not want to return to a work environment where she would continue to subjected to retaliation.

292. Based on Defendants' conduct, Scott reasonably believed she would eventually be terminated if she returned to work at A&B.

293. Scott began searching for other employment while she was on FFCRA leave.

294. Scott resigned her employment with A&B on June 17, 2020.

295. Scott accepted a lower paying position elsewhere to avoid being subjected to ongoing harassment and retaliation at A&B.

## COUNT I: HOSTILE WORK ENVIRONMENT BASED ON SEXUAL HARASSMENT IN VIOLATION OF 42 U.S.C.A § 2000e-2.
### (Asserted Against Defendant A&B Only).

296. Scott re-alleges and incorporates by reference the allegations set forth in paragraphs 1-295, above.

297. During her employment with A&B. Scott was subjected to offensive and harassing conduct by Ellis, Ferns Jr., and several of her male co-workers based on her gender.

298. The unwelcomed sexual harassment against Scott was sufficiently severe or pervasive to affect the terms, conditions or privileges of Scott's employment.

299. The unwelcomed sexual harassment had the purpose and/or effect of unreasonably interfering with Scott's job duties and created an intimidating, hostile, and offensive working environment. *See* 29 C.F.R. §1604.11(a)(3).

300. Defendants knew or should have known of the sexually harassing conduct against Scott.

301. Defendants condoned, tolerated and ratified the sexually harassing conduct against Scott.

302. The sexually harassing conduct against Scott was offensive and abusive to her.

303. The offensive and sexually harassing conduct of Ellis, Ferns Sr., and Scott's co-workers created a hostile and/or abusive work environment for the reasonable person similarly-situated to Scott.

304. As a result of the conduct of Ellis, Ferns Jr., and certain of A&B's male employees, all of which is imputable to A&B, Scott has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

305. Defendants acted with malice or reckless indifference to the rights of Scott when they condoned, tolerated, ratified and subjected her to the sexually harassing conduct, thereby entitling Scott to an award of punitive damages.

306. To remedy the violation of Scott's rights secured by 42 U.S.C.A § 2000e-2, Scott requests that the Court award her the relief prayed for below.

**COUNT II: QUID PRO QUO SEXUAL HARASSMENT IN VIOLATION OF 42 U.S.C.A § 2000e-2.**
**(Asserted Against Defendant A&B Only).**

307. Scott re-alleges and incorporates by reference the allegations set forth in paragraphs 1-307, above.

308. During her employment, Scott was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors by Ellis and Ferns Jr.

309. The harassment against Scott was based on her gender.

310. Scott's submission to the unwelcome sexual advances by Ellis and/or Ferns Jr. was an express or implied condition for receiving job benefits and/or continued employment. *See* 29 C.F.R. §1604.11(a)(1).

311. When Scott refused to submit to Ellis and Ferns Jr.'s sexual advances and began a romantic relationship with another male, Darrell, Ellis and Ferns Jr. demoted Scott and began to treat her less favorably.

312. As a result of Ellis and Ferns Jr.'s conduct, which is imputable to A&B, Scott has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

313. Ellis and Ferns Jr. acted with malice or reckless indifference to the rights of Scott when they subjected her to their quid pro quo sexual demands, thereby entitling Scott to an award of punitive damages.

314. To remedy the violation of Scott's rights secured by 42 U.S.C.A § 2000e-3, Scott requests that the Court award her the relief prayed for below.

## COUNT III: GENDER DISCRIMINATION IN VIOLATION OF 42 U.S.C.A § 2000e-2. (Asserted Against Defendant A&B Only).

315. Scott re-alleges and incorporates by reference the allegations set forth in paragraphs 1-314, above.

316. A&B, Ellis, and Ferns Jr. treated Scott differently than other similarly situated employees based on her gender.

317. A&B, Ellis, and Ferns Jr. discriminated against Scott on the basis of her gender throughout her employment with the company.

318. As a result of A&B, Ellis, and Ferns Jr.'s discriminatory conduct, Scott was forced to quit her employment with A&B.

319. A&B violated 42 U.S.C.A § 2000e-2 when A&B, Ellis, and Ferns Jr. discriminated against Scott based on her gender, resulting in her constructive discharge.

320. As a result of Ellis and Ferns Jr.'s conduct, which is imputable to A&B, Scott has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

321. Ellis and Ferns Jr. acted with malice or reckless indifference to the rights of Scott when they subjected her to their quid pro quo sexual demands, thereby entitling Scott to an award of punitive damages.

322. To remedy the violation of Scott's rights secured by 42 U.S.C.A § 2000e-3, Scott requests that the Court award her the relief prayed for below.

### COUNT IV: UNLAWFUL RACE DISCRIMINATION BY ASSOCIATION IN VIOLATION OF 42 U.S.C. § 2000e-2(a), *et seq.* (Asserted Against Defendant A&B Only).

323. Scott re-alleges and incorporates by reference the allegations set forth in paragraphs 1-322 above.

324. Ellis and Ferns Jr. subjected Scott to different employment rules, practices, and standards because of her open association and romantic relationship with an African American, in violation of 42 U.S.C. § 2000e-2(a).

325. Ellis and Ferns Jr. demoted Scott from without just cause because of her open association and romantic relationship with an African American, in violation of 42 U.S.C. § 2000e-2(a).

326. Ellis and Ferns Jr. discrimination against Scott violated of the rights secured to her by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by the Civil Rights Act of 1991.

327. By the conduct described above, Ellis and Ferns Jr. intentionally violated Scott's rights under Title VII.

328. As a result of the violation of Scott's Title VII rights, Scott is entitled to equitable and injunctive relief, including "rightful place" and "make whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Defendants' unlawful actions.

329. As a result of Ellis, Ferns Jr.'s associational discrimination against Scott in violation of Title VII, which is imputable to A&B, Scott has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Scott to injunctive, equitable, and compensatory monetary relief.

330. As a result of Ellis, Ferns Jr.'s associational discrimination against Scott in violation of Title VII, which is imputable to A&B, Scott has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

331. Defendants acted with malice or reckless indifference to the rights of Scott when they discriminated against Scott, thereby entitling Scott to an award of punitive damages.

332. To remedy the violation of Scott's rights secured by Title VII, Scott requests that the Court award her the relief prayed for below.

### COUNT V: RETALIATORY CONSTRUCTIVE DISCHARGE IN VIOLATION OF 42 U.S.C.A § 2000e-3. (Asserted Against Defendant A&B Only).

333. Scott re-alleges and incorporates by reference the allegations set forth in paragraphs 1-333, above.

334. Scott opposed sexual harassment at A&B through her March 25, 2020 text message to Ellis; her March 31, 2020 Sexual Harassment Complaint to Ellis, Ferns Jr., and Oliver; and through her repeated demands that Defendants respond to and investigate her Sexual Harassment Complaint during the months of April and May, 2020.

335. Pursuant to 42 U.S.C.A § 2000e-3, it is an unlawful discriminatory practice "for an employer to discriminate against any of its employees...because they have opposed any practice made an unlawful employment practice by this subchapter, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

336. As a result of Scott's opposing sexual harassment at A&B, Defendants first attempted to terminate Scott's employment, and then when Scott showed up to work anyways, Defendants engaged in retaliatory conduct that was intended to, and ultimately had the effect of, forcing Scott to quit her employment.

337. Defendants retaliated against Scott when they deliberately and purposefully deleted her email; blocked her from using Promax; gave her sales leads to other employees; gave her commissions to other employees; and when Defendants refused to acknowledge, respond to, or investigate Scott's Sexual Harassment Complaint.

338. The Cumulative effect of Defendants' retaliation was to prevent Scott from performing her job; depriving her of the opportunity to earn an income through the sale of automobiles; and to send a clear message to Scott that Defendants were unwilling to do anything about the sexual harassment Scott had experienced and would do nothing to stop or prevent future sexual harassment.

339. Defendants' conduct was in violation of 42 U.S.C.A § 2000e-3.

340. As a result of Ellis, Ferns Jr., and Oliver's retaliatory discrimination against Scott in violation of 42 U.S.C.A § 2000e-3, which is imputable to A&B, Scott has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Scott to injunctive, equitable, and compensatory monetary relief.

341. As a result of Ellis, Ferns Jr., and Oliver's retaliatory discrimination against Scott in violation of 42 U.S.C.A § 2000e-3, which is imputable to A&B, Scott has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

342. Defendants acted with malice or reckless indifference to the rights of Scott when they retaliated against Scott, thereby entitling Scott to an award of punitive damages.

343. To remedy the violation of Scott's rights secured by 42 U.S.C.A § 2000e-3, Scott requests that the Court award her the relief prayed for below.

## COUNT VI: RETALIATORY CONSTRUCTIVE DISCHARGE IN VIOLATION OF W. VA. CODE § 5-11-9(7)(C). (Asserted Against All Defendants).

344. Scott re-alleges and incorporates by reference the allegations set forth in paragraphs 1-343, above.

345. Scott opposed sexual harassment at A&B through her March 25, 2020 text message to Ellis; her March 31, 2020 Sexual Harassment Complaint to Ellis, Ferns Jr., and Oliver; and through her repeated demands that Defendants respond to and investigate her Sexual Harassment Complaint during the months of April and May, 2020.

346. Pursuant to W. Va. Code §5-11-9(7)(C), it is an unlawful discriminatory practice "for any person...to… [e]ngage in any form of reprisal or otherwise discriminate against any person because he or she has opposed any practices or acts forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

347. As a result of Scott's opposing sexual harassment at A&B, Defendants first attempted to terminate Scott's employment, and then when Scott showed up to work anyways, Defendants engaged in retaliatory conduct that was intended to, and ultimately had the effect of, forcing Scott to quit her employment.

348. Defendants retaliated against Scott when they deliberately and purposefully deleted her email; blocked her from using Promax; gave her sales leads to other employees; gave her commissions to other employees; and when Defendants refused to acknowledge, respond to, or investigate Scott's Sexual Harassment Complaint.

349. The Cumulative effect of Defendants' retaliation was to prevent Scott from performing her job; depriving her of the opportunity to earn an income through the sale of automobiles; and to send a clear message to Scott that Defendants were unwilling to do anything about the sexual harassment Scott had experienced and would do nothing to stop or prevent future sexual harassment.

350. Defendants' conduct violated W. Va. Code §5-11-9(7)(C).

351. As a result of Defendants' retaliatory discrimination against Scott in violation of W. Va. Code §5-11-9(7)(C), Scott has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Scott to injunctive, equitable, and compensatory monetary relief.

352. As a result of Defendants' retaliatory discrimination against Scott in violation of W. Va. Code §5-11-9(7)(C), Scott has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

353. Defendants acted with malice or reckless indifference to the rights of Scott when they engaged in retaliatory discrimination against Scott, thereby entitling Scott to an award of punitive damages.

354. To remedy the violation of Scott's rights secured by W. Va. Code §5-11-9, Scott requests that the Court award her the relief prayed for below.

**COUNT VII: AIDING AND ABETTING DISCRIMINATION IN VIOLATION OF
W. VA. CODE § 5-11-9(7)(A).
(Asserted Against All Defendants).**

355. Scott re-alleges and incorporates by reference the allegations set forth in paragraphs 1-355, above.

356. Pursuant to W. Va. § 5-11-9(7)(A), it is an unlawful discriminatory practice "for any person...to…[e]ngage in any form of threats or reprisal, or to engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss or to aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices defined in this section."

357. Throughout Scott's employment, Ellis and Ferns Jr. engaged in sexually harassing conduct towards Scott in cooperation and concert with Scott's co-workers and encouraged, aided, and abetted this conduct by Scott's co-workers.

358. Ellis, Ferns Jr, and Oliver unlawfully conspired in a retaliatory scheme to force Scott to quit and aided and abetted one another in the furtherance of this retaliatory scheme.

359. As a result of Defendants' conduct against Scott in violation of W. Va. Code §5-11-9(7)(A), Scott has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Scott to injunctive, equitable, and compensatory monetary relief.

360. As a result of Defendants' conduct against Scott in violation of W. Va. Code §5-11-9(7)(A), Scott has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

361. Defendants acted with malice or reckless indifference to the rights of Scott when they engaged in their unlawful aiding and abetting or retaliatory discrimination.

34

362. To remedy the violation of Scott's rights secured by W. Va. Code §5-11-9, Scott requests that

the Court award her the relief prayed for below.

**PRAYER FOR RELIEF.**

WHEREFORE, Plaintiff Charity Scott requests judgment in her favor against each

Defendant, joint and severally, containing the following relief:

(a) A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

(b) An injunction and order permanently restraining Defendant from engaging in such unlawful conduct in the future;

(c) An order directing Defendant to place Scott in the position she would have occupied but for Defendants' discriminatory treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Scott;

(d) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Scott for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

(e) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Scott for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

(f) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Scott for harm to her professional and personal reputation and loss of career fulfillment;

(g) An award of damages for any and all other monetary and/or non-monetary losses suffered by Scott in an amount to be determined at trial, plus prejudgment interest;

(h) An award of punitive damages;

(i) An award of costs that Scott has incurred in this action, as well as Scott's reasonable attorneys' fees to the fullest extent permitted by law; and

(j) Awarding such other and further relief that this Court deems necessary and proper.

Respectfully submitted,

*/s/Chris P. Wido*
Chris Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, Ohio 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: chris.wido@spitzlawfirm.com

*Attorney for Plaintiff Charity Scott*

## **JURY DEMAND**

Plaintiff Charity Scott demands a trial by jury by the maximum number of jurors permitted.

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**